Deyo, J.
The Board of Regents has sustained the findings of the grievance committee to the effect that petitioner, a physician, is or has been addicted to the use of narcotic drugs, and pursuant to paragraph (c) of subdivision 2 of section 6514 of the Education Law has suspended his license for two years. This is a proceeding to review such determination.
For upwards of a quarter of a century the petitioner was associated with various State institutions for the care of defectives and delinquents, first as a staff member, and later as superintendent. Throughout a large part of this period he was afflicted with renal colic, which necessitated the use of narcotic drugs in ever increasing amounts, to alleviate the pain accompanying this malady. So far as the record indicates these drugs were all administered pursuant to the direction and on the prescription of other physicians. Petitioner has now been retired from State service, due to his physical condition brought about by the disease from which he suffers.
The first and primary question is what constitutes drug addiction within the intent and meaning of paragraph (c) of subdivision 2 of section 6514 of the Education Law. Our own statutes are silent on this score. However, the Federal Public Health and Welfare Act (U. S. Code, tit. 42, § 201, subd. [k]) does define an “ addict ” as “ * * * any person who habitually uses any habit-forming narcotic drugs so as to endanger the public morals, health, safety, or welfare, or who is or who has been so far addicted to the use of such habit-forming narcotic drugs as to have lost the power of self-control with reference to his addiction ”.
*7 It will be borne in mind that the regulation and control of the use of narcotic drugs has long been recognized as the joint responsibility of the State and Federal Governments. Co-operation between the two is specifically directed by both the Federal act (U. S. Code, tit. 42, § 242, subd. [b]), and the Uniform Narcotic Drug Law of our own State (Public Health Law, § 443). It would indeed be unfortunate and a decided blow to the orderly administration of both Federal and State law on this subject if differences in defining essential terms should arise.
Reason as well as comity persuaded us to adopt the Federal definition. The underlying purpose of both Federal and State legislation on this subject, apart, of course, from the tax angle, is to eliminate so far as possible the abuse and not the use of ■narcotics. It is a matter of common knowledge that narcotic drugs, properly administered, are not only beneficial but essential in the treatment of disease. Unfortunately, they are habit forming and only too often there comes a time when they are utilized, not for any beneficial medical purpose, but solely for the satisfaction of the appetite. It is at this point that the State becomes an interested party, for it is at this point that the recognized deleterious effects, both on society and the individual, first become apparent. Were it not for these deleterious effects, the use Of narcotic drugs would be no more a matter of State concern than the use of tea or coffee.
We are led to the conclusion that the Legislature, when it constituted drug addiction on the part of a physician a ground for a disciplinary action, had in mind the pernicious consequences which accompany the abuse of narcotic drugs, and that the phrase “ addicted to the use ” was employed in that sense. Mere “ use ” was not put beyond the pale, but a “ use ” which gave rise to recognized consequences. The statute makes that clear by including addiction to all drugs having similar effect, ’ ’ to that of morphine or cocaine.
We are not impressed with the argument of the respondent to the effect that “ addicted ” as used in the statute has the broad and all inclusive meaning of “ habituated,” regardless of degree. Such argument ignores entirely the purpose of the statute and makes “ use ” the criterion to the total exclusion of the reason for and the effect of such use. Likewise, it ignores the obvious fact that “ addiction ” is an individual and not a group problem, and that the amount of drugs which may be properly and lawfully administered will vary according to the reaction and tolerance of the patient. Under respondent’s theory a person required by his physician to *8 regularly use even an infinitesmal quantity of morphine having no deleterious effects whatsoever, would be branded as an addict, no matter what his physical condition. or medical necessity might be. Any such interpretation of the statute has no reasonable basis in law, and hence, cannot be sustained even if we deem applicable the recently developed doctrine tending to limit in certain instances the court’s power to review an administrative adjudication on statutory construction. (Red Hook Cold Storage Co., v. Department of Labor, 295 N. Y. 1; Matter of Mounting & Refinishing Co. v. McGoldrick, 294 N. Y. 104.)
Not to belabor the point further, suffice is it to say that in our opinion, drug addiction, as used in the statute, means an habitual use to the extent and with the results described in the Federal act.
Under this concept of the meaning of “ addiction,” the quantity of drugs used, even though it be ‘ ‘ heroic, ’ ’ as petitioner admits, or even “ excessive,” as another doctor ■ testified, will not sustain the finding reached below. The evidence must go farther than that and demonstrate at the very least some deleterious effect or a deterioration in the petitioner, rendering it unsafe or improper for him to practice his profession. The record does not disclose any such evidence. On the contrary, it affirmatively appears that the drugs were never used except for the relief of pain; that in the absence of pain they were neither required nor desired, and that petitioner exhibited none of the deterioration consistently demonstrated by drug addicts.
We are, of course, aware that the grievance committee, which made this finding, is composed of physicians of the highest professional standing and ability. We likewise appreciate that the evidence herein presented, when viewed through their professional eyes, may very well be susceptible of a different interpretation than we might accord it. We concede that the members of the committee may utilize their expert knowledge and experience in the evaluation of evidence submitted to them. However, they may not use that knowledge as a substitute for proof of essential facts. The statute itself provides that the determination of the committee “ * * * shall be founded upon sufficient legal evidence to sustain the same.” (Education Law, § 6515, subd. 5.) That evidence must be of probative value and a decision based upon less than that is “ arbitrary and baseless.” (Matter of Stammer v. Board of Regents, 287 N. Y. 359, 365.) Administrative hearing officials may not act upon their own knowledge nor base their decisions *9 on matters dehors the record. “ The trier of the fact can find the fact only on the evidence and not on his own knowledge. ". (Matter of Greenebaum v. Bingham, 201 N. Y. 343, 347; Matter of Collins v. Behan, 285 N. Y. 187; People ex rel. Packwood v. Riley, 232 N. Y. 283, 286; Matter of New Rochelle Water Co. v. Maltbie, 248 App. Div. 66, 73; People ex rel. Kiebrick v. Roosevelt, 1 App. Div. 577.)
The Legislature has granted this petitioner the right to a judicial review of the determination of the Board of Regents. Such right becomes naught but an empty form if the administrative hearing officials, no matter how well qualified, are permitted to determine contested matters on the basis of their own professional opinions rather than on the printed record. (People ex rel. Fordham Manor Reformed Church v. Walsh, 244 N. Y. 280, 290.)
The determination of the Board of Regents should be annulled on the law, with $50 costs and disbursements to the petitioner.
Foster, P. J., Hefeernan, Santry and Bergan, JJ., concur.
Determination of the Board of Regents annulled, on the law, with $50 costs and disbursements to the petitioner.